CLARA HELLMAN HELLER TRUST NO. 7610, WELLS FARGO BANK & UNION TRUST COMPANY, TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6932. Promulgated August 15, 1946.

*Lloyd W. Dinkelspiel, Esq.,* for the petitioner.
*A. James Hurley, Esq.,* for the respondent.

OPINION.

MURDOCK, *Judge*: The Commissioner determined a deficiency of $26,119.22 in income tax for the calendar year 1941. The issues for

decision are (a) whether the Commissioner erred in disallowing a part of a deduction of $56,000 paid by the petitioner in 1941 to a lessee to cancel a lease so that it could enter into a more desirable contract with the United States Government for a lease of the premises with an option to buy, and, (b) whether he erred in disallowing a part of a deduction of $4,800 paid by the petitioner in 1941 for services rendered in negotiating the above transactions. The facts have been stipulated and the stipulation is adopted as the findings of fact.

The petitioner is a trust created in 1938 by Clara Hellman Heller. A bank is trustee. The return for 1941 was filed with the collector of internal revenue for the first district of California.

The petitioner leased a ranch of about 37,333 acres to Edward A. Heller on October 31, 1939, for five years from November 1, 1939. The lessee could cancel the lease at the end of any year by giving notice of 90 days. The lessee took possession and entered into subleases. He continued in possession and paid the rent until his lease was canceled.

The United States Government desired to lease or buy the ranch for a military reservation in 1940 and entered into negotiations with the petitioner to that end. The petitioner was unable to effectuate any lease or sale of the ranch to the United States of America or to any other person unless it first secured a cancellation of the lease to Edward H. Heller; and Edward H. Heller was unable to agree to such cancellation unless he also secured cancellation of the subleases which he had entered into. It was agreed between them that there should not be canceled from under the lease about 450 acres of the leased property which was used as headquarters for the operation of the ranch and about 1,393 additional acres which were subleased to R. I. Branch under an agreement which could not be canceled. The petitioner and Edward H. Heller estimated the cost to Heller of canceling the lease and subleases, exclusive of the headquarters acreage and sublease to R. I. Branch above referred to, and agreed that such cost would be $65,000, which amount would have to be paid by the petitioner to Heller in order to make the property available to the United States.

Contemporaneously with the negotiations between the petitioner and Edward H. Heller, negotiations took place between the petitioner and the United States as to the basis upon which the ranch property, with the exceptions above noted, should be leased by the petitioner to the United States.

The negotiations above referred to were consummated between the petitioner and Heller and between the petitioner and the United States of America and resulted in the execution of an agreement dated the 21st day of October 1940, between the petitioner and Heller, and in a lease dated the same date between the petitioner and the United States of America.

Heller agreed to terminate and cancel all subleases theretofore entered into by him as sublessor except a certain sublease dated May 1, 1940, entered into between him and R. I. Branch, sublessee, covering approximately 1,400 acres hereinbefore referred to, and to surrender his lease of the ranch property except in so far as it covered the ranch headquarters tract and the area under sublease to Branch. It was further provided in the agreement between the petitioner and Heller that Heller should be paid the sum of $65,000 in consideration of the execution by him of the agreement, which sum was to be paid in installments of $9,000 on or before December 15, 1940, and of $8,000 each, commencing with the 15th day of January 1941, until the sum of $65,000 should have been paid; it was further provided that the payments should be payable out of, and only out of, the amounts received or to be received by the petitioner as rental from the United States of America under the lease between the petitioner and the United States of America or from the proceeds of the purchase of the ranch should the United States of America exercise its option to purchase.

The ranch property, except the headquarters area and the area under sublease to Branch, was leased to the United States of America for a term beginning on the 21st day of October 1940, and ending with the 30th day of June 1941, with an option to the United States to renew the lease from year to year upon 90 days' advance notice, no renewal, however, to extend the period of occupancy beyond the 30th day of June 1946. The monthly rental for the initial term was stated to be $10,416.66, and it was provided that the rental of $10,416.66 was to continue for that part of the first renewed term up to and including one year after the commencement of the original term and thereafter the rental was to be $5,000 per month. It was provided that the Government in any event should pay to the petitioner, as lessor, rental in the amount of $125,000 for the first 12 months of the term, commencing with the 21st day of October 1940, at the monthly rate of $10,416.66, and that thereafter the rental should be at the rate of $5,000 per month during the renewal period of the lease. The rental in excess of $5,000 per month for the first year of the lease was charged by the petitioner in order to absorb the additional costs incurred by the petitioner in canceling its lease with Heller. The petitioner granted to the Government an option to purchase the property, including the headquarters area and the area subject to sublease to Branch, for the sum of $500,000.

The United States of America went into possession of the premises and Heller vacated or caused the premises to be vacated on or about the date of the agreements, October 21, 1940. The United States paid to the petitioner the sum of $10,416.66 per month up to and in-

cluding October 21, 1941. The petitioner paid to Heller the sum of $9,000 prior to the end of the taxable year 1940, and the sum of $56,000 during the taxable year 1941.

Jesse H. Steinhart, attorney at law, rendered legal services to the petitioner in the year 1940 in connection with the lease between the petitioner and the United States, and was paid therefor in the year 1941 as compensation the sum of $1,500. Additional services were rendered by him to the petitioner in the year 1941, for which compensation in the amount of $300 was paid in 1941.

R. Pardow Hopper rendered services to the petitioner during the year 1940 as its agent in carrying on negotiations with the United States, which culminated in obtaining the aforesaid lease, and he was paid as compensation therefor in the year 1941 the sum of $3,000.

The United States of America, on or about March 31, 1941, exercised its option to renew the lease for a period of one year from and after July 1, 1941. Subsequently, on or about March 18, 1942, the lease was again renewed by the United States for an additional period of one year from and after July 1, 1942.

The United States, on or about December 17, 1942, pursuant to its option as provided in the lease, purchased the ranch from the petitioner.

The petitioner is, and in the years 1940 and 1941 and at all times herein mentioned was, on a cash receipts and disbursements, calendar year basis, for Federal income tax purposes.

The Commissioner, in determining the deficiency, added to income as reported $42,735.32 representing disallowance of $41,391.32 of the deduction of $56,000 claimed as payment on account of cancellation of the lease and disallowance of $1,344 of the deduction of $4,800 claimed as expenses in connection with the lease. His explanation was in part as follows:

* * * The amount of $56,000.00 paid in 1941 to Edward H. Heller was claimed on the income tax return for 1941 as deductible in its entirety. On the income tax return filed for the year 1940, the above-mentioned $9,000.00 was claimed as a deduction and the return was accepted as filed. It is held that the above mentioned $56,000.00 is amortizable over the period of time remaining on January 1, 1941 (January 1, 1941 to November 1, 1944) that the above-mentioned lease that had been made with Edward H. Heller had provided for producing a deduction of twelve forty-sixths of $56,000.00, or $14,608.68, and a disallowance of $41,391.32.

In 1941 the amount of $4,800.00 was paid for services performed in connection with obtaining in 1940 the lease with the United States Government mentioned hereinabove. The entire amount was claimed on the return as deductible in the year 1941. It is held that said $4,800.00 should be amortized over the life of said lease, October 21, 1940 to June 30, 1941, without taking renewals into account, and that eighteen twenty-fifths of $4,800.00 is deductible in the year 1941, producing a deduction of $3,456.00 and a disallowance of $1,344.00.

The petitioner paid Heller $65,000 to cancel his lease. Thereafter, the net income from the property would not be reflected clearly until gross income therefrom was offset in some way by a deduction or deductions for the $65,000 expenditure. The problem of how to deduct amounts paid to cancel leases has not lent itself to a simple logical solution which proves entirely satisfactory in all cases. Some taxpayers have attempted to deduct such expenditures as ordinary and necessary expenses of the year of payment or accrual (sec. 23 (a), I. R. C.), but the Commissioner resisted. He pointed out, *inter alia*, that the beneficial effect of the expenditure would extend over the unexpired term of the canceled lease and the entire amount ought not to be offset against the income of one year alone, thus distorting income for that year, but should be spread over the longer period through deductions, authorized under section 23 (1) for depreciation, representing the gradual exhaustion of the beneficial effect of the outlay. Some spread obviously tends to reflect annual income more clearly. See section 43. Different taxpayers have urged the adoption of different rules on this subject to seek the greatest benefit in their particular cases. The desirability of some general rule is apparent both from the standpoint of administration and from that of taxpayers needing some settled practice to plan for and follow.

An expenditure of this kind was allowed to be deducted as an ordinary and necessary expense in *Higginbotham-Bailey-Logan Co.*, 8 B. T. A. 566, but that case was soon repudiated in *Henry B. Miller*, 10 B. T. A. 383, in which it was held that an amount paid for cancellation of a lease was in the nature of a capital expenditure to obtain possession during the unexpired term of the canceled lease and was recoverable through annual deductions for depreciation spread over the unexpired term of the canceled lease. This rule is now generally accepted. Mertens Law of Federal Income Taxation, vol. 2, sec. 12.32, footnote. *Charles B. Bretzfelder*, 21 B. T. A. 789; *Harriet B. Borland*, 27 B. T. A. 538.

Both parties here recognize that expenditures made to cancel leases are capital in their nature and are not deductible as ordinary and necessary expenses, but are to be spread over a period. The petitioner argues that the rules established by the cases are that amounts paid to cancel leases merely to permit the owner to regain possession for his own use are deductible over the unexpired term of the canceled lease, but where the cancellation is sought for the purpose of obtaining another capital asset, as a new and more desirable lease, they are to be recovered through deductions spread over the life of the new asset. We do not find this nice distinction in the decided cases nor do we deem it a real distinction. $9,000 of the total of $65,000 paid to cancel the Heller lease was paid and recovered through a deduction against

income claimed and allowed in 1940. The remaining $56,000 was paid in 1941. A taxpayer on a cash basis has no right to any deduction until he pays the amount sought to be deducted. A payment must be deducted over some period beginning with the taxable year in which paid. The taxpayer argues that the payment for cancellation of the lease was made solely as a prerequisite of obtaining the new lease with the Government, it is a part of the cost of that asset, and it should be recovered ratably over the term of that new lease. It argues further that there is no asset which is exhausting over the unexpired term of the canceled lease and it is unrealistic to spread the deductions over that longer period when the petitioner is being compensated for the $65,000 through payments from the new lessee during the first 12 months of the new lease. Some merit must be recognized in this argument but a part of it has been considered in the cases cited above. It also overlooks the fact that the canceled lease related to a definite period and that there is reason in spreading the cost of cancellation over that period. The possession obtained by the cancellation is possession for that period particularly, whether longer or shorter than the term of the new lease. We see no sufficient reason here to depart from the general rule that the cost of canceling a lease is recoverable through deductions spread over the unexpired term of that lease.

The next question is, What is "a reasonable allowance" for the exhaustion of this term during 1941? No reason or basis appears for allowing more or less than a ratable portion of the $56,000 which the 12 months of 1941 bear to the unexpired term of the Heller lease as of January 1, 1941. The Commissioner has allowed the amount thus computed.

The Commissioner has held that the $4,800 paid in 1941 for services was a capital cost of the new lease and should be recovered over the life of that lease, October 21, 1940, to June 30, 1941, without taking renewals into account. No part of the cost could be recovered in 1940 because payment was not made until 1941. The entire amount should be recovered in that year if the renewals are not to be taken into account. The Commissioner has not made any issue as to renewals being taken into account, so no decision is required upon that point.

*Decision will be entered under Rule 50*