Cosmopolitan Corporation v. Commissioner. The Davies Building, Inc. v. Commissioner.
Cosmopolitan Corp. v. Commissioner
Docket Nos. 61421, 61422.
United States Tax Court
T.C. Memo 1959-122; 1959 Tax Ct. Memo LEXIS 127; 18 T.C.M. (CCH) 542; T.C.M. (RIA) 59122; June 12, 1959
Sheldon V. Ekman, Esq., 125 Park Avenue, New York, N. Y., for the petitioners. Martin D. Cohen, Esq., and Paul D. Barker, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined deficiencies in income tax as follows: Petitioner
Year
Deficiency
Cosmopolitan Corporation
1951
$24,728.57
1952
16,011.13 The Davies Building, Inc.
8-1-52 to
12-31-52
541.09
The issues are (1) is Cosmopolitan Corporation entitled to a deduction of $128,796.12 in 1952 as a loss from abandonment or as a loss of useful life or by reason of obsolescence of certain buildings, or, if not, (a) is Cosmopolitan Corporation entitled to deduct 7/18 and The Davies Building, Inc., entitled to deduct 5/18 of the undepreciated cost *128 of these buildings in 1952, or, if not, (b) is The Davies Building, Inc., entitled to deduct 5/12 of the undepreciated cost of these buildings in 1952; and (2) was The Davies Building, Inc., correct in (a) excluding from income in 1952 rentals which it waived, and (b) in deducting in 1952 amounts paid to or on behalf of its tenants as inducements to these tenants to vacate its premises. The deficiencies determined in Cosmopolitan Corporation's income tax for 1951 are due to respondent's disallowance of a net operating loss claimed in 1952 and carried back to 1951 and will be resolved by deciding the issues pertaining to 1952. Other issues raised by Cosmopolitan Corporation have been settled by the parties pursuant to stipulation. Findings of Fact The stipulated facts are found. Petitioner, Cosmopolitan Corporation, hereafter referred to as Cosmopolitan, is a corporation organized on February 3, 1931, under the laws of Delaware, and petitioner, The Davies Building, Inc., hereafter referred to as Davies, Inc., is a corporation organized on June 24, 1952, under the laws of New York. Cosmopolitan prepared its returns for 1951 and 1952 according to an accrual method of accounting *129 and filed them with the director of internal revenue for the third and Upper Manhattan districts of New York, respectively. Davies, Inc., prepared its return for the period August 1, 1952 through December 31, 1952 according to an accrual method of accounting and filed it with the director of internal revenue for the Upper Manhattan district of New York. During the first half of 1952, Cosmopolitan owned contiguous land and buildings, hereafter called the Park Avenue properties, located at 67-69-71-73 East 57th Street and 460 Park Avenue, New York, New York, which were originally acquired prior to 1926 by a predecessor corporation. The buildings were brownstone dwellings which had been converted to apartments and commercial use and were operated as rental properties by Cosmopolitan from the time acquired. The Park Avenue properties had an original total basis to Cosmopolitan of $482,398.26 for the buildings and $847,522.47 for the land. The undepreciated basis of the buildings on July 30, 1952, according to Cosmopolitan's books, was $128,796.12. The remaining useful life of the buildings on the Park Avenue properties on January 1, 1952, as estimated on Cosmopolitan's 1952 income tax *130 return, was 1/3 to 5 1/3 years, except for the building located at 460 Park Avenue, which had an estimated life of 19 2/3 years. During the years in issue Marion Douras Brown, also known as Marion Davies, and hereafter so called, was the sole stockholder of Cosmopolitan and Davies, Inc. She is a well-known personality and subject to newspaper publicity. In October 1951, Marion Davies retained Arnold M. Grant, an attorney, to make a survey of the real estate holdings of Cosmopolitan. Grant had extensive experience in the acquisition, operation and management of real estate. On November 23, 1951, Grant rendered a written report to Marion Davies in which he urged, inter alia, that the buildings on the Park Avenue properties be demolished and that a new modern office building be erected on the land. This recommendation was based primarily on the fact that the use of the buildings in 1951 represented "as classic an example of uneconomic development of property" as he had ever seen. After Grant submitted his report, conferences took place between Marion Davies, A. Morgan Maree and Associates, her business managers, and Gregson Bautzer, her attorney and Grant's law partner. Grant was *131 requested to submit additional facts. The leases of all tenants in the Park Avenue properties either had already expired or were due to expire not later than September 30, 1952, which the exception of the lease of the National City Bank of New York in 460 Park Avenue, which lease had a termination date of April 30, 1955. Grant undertook negotiations with the National City Bank in October or November 1951, in order to determine whether or not the bank would agree to vacate its quarters in exchange for space in a new building. The bank agreed in principle early in 1952 but did not execute a new lease until later in that year. In 1952, the corner of 57th Street and Park Avenue was a valuable piece of land in a rapidly changing neighborhood. The postwar development of office buildings in the area had caused a change in the character of the neighborhood from residential to business. Because of the change in the neighborhood, the land alone at 57th Street and Park Avenue, if free and clear of tenancies, had a fair market value of not less than $1,500,000. The old buildings had no salvage value and the estimated cost of demolition was $60,000 over and above any salvage. On July 30, 1952, the *132 Park Avenue properties were conveyed by Cosmopolitan to Davies, Inc., in exchange for the issuance by Davies, Inc., of all of its capital stock to Marion Davies. It is stipulated that this transaction was entered into pursuant to a plan of reorganization under section 112(b)(11), I.R.C. 1939. Grant advised that the Park Avenue properties be segregated from other property owned by Cosmopolitan. He was of the opinion that liabilities incurred in improving the property should be limited to the property improved. He further felt that tax considerations in the event of sale made it desirable to have separate entities for separate parcels of property. On July 30, 1952, Cosmopolitan charged off on its books of account the undepreciated remaining basis of the old buildings in the amount of $128,796.12. This amount was deducted by Cosmopolitan in its income tax return for the year 1952. In the opening entries on the books of Davies. Inc., the land was recorded at $847,522.47 and the buildings at zero. In February or March 1952, Grant retained Maurice Whitebook, an attorney, who was an expert in rent control and tenant matters, to assist in removing the tenants in possession of the Park *133 Avenue properties. The eviction of tenants in possession was subject to the provisions of section 8558 of the Emergency Business Space Rent Control Law of New York and to the provisions of section 58 of the Rent and Eviction Regulations of the Temporary State Housing Rent Commission promulgated under the Emergency Housing Rent Control Law of New York. Grant was advised by Whitebook that under this statute and these regulations, the landlord could evict only if it had the firm intention of itself demolishing the old buildings and erecting a new building. Whitebook further advised that if a new building was not erected, either Marion Davies individually, Cosmopolitan, Davies, Inc., or all three might be potentially liable to evicted tenants for damages. Grant advised Marion Davies that the removal of tenants, procurement of certificates for building materials, and the demolition of the old buildings would take about 18 months from January 1952. Davies, Inc., could have instituted legal proceedings under the rent control statutes of New York and about 6 months thereafter could have obtained possession from its statutory tenants. However, Grant was anxious to avoid unfavorable publicity *134 attendant upon eviction proceedings which might discourage potential high-grade tenants from renting office space in the new building. All residential tenants vacated amicably. Seven actions were instituted against commercial tenants. None went to trial and all commercial tenants agreed to and did vacate amicably. On October 29, 1952, Cosmopolitan, as "owner" of 69 East 57th Street, entered into an agreement with Evelyn Breivogel, tenant, whereby Cosmopolitan waived the payment of rent for October, November and December 1952. On October 30, 1952, Cosmopolitan, as "owner" of the same premises, entered into an agreement with Mary Lewis, tenant, whereby Cosmopolitan waived the payment of rent for the same months. On November 28, 1952, Cosmopolitan, as "owner" of 71 East 57th Street, entered into an agreement with Wine-Chapin Antiques, Inc., tenant, whereby Cosmopolitan waived the payment of rent for December 1952. In 1952, the monthly rental charged Breivogel, Lewis, and Wine-Chapin Antiques, Inc., was $67.50, $64.25 and $256, respectively. The amicable removal of all statutory tenants took until May 28, 1953. The majority of these tenants moved subsequent to 1952. It is stipulated *135 that "in order to induce tenants to vacate its premises, Davies [, Inc.,] made cash payments to or on behalf of tenants in the amount of $3,811.23, waived rents due from tenants in the amount of $2,647.25 and paid expenses in the amount of $141.58 for the repair and decoration of a new apartment for one tenant. The respective amounts of $3,811.23 and $141.58 were deducted by Davies [, Inc.,] in its income tax return for the taxable period August 1 to December 31, 1952. The amount of $2,647.25, representing rents waived, was not included in gross income in such return." Davies, Inc., retained Kahn and Jacobs, architects, to prepare plans, sketches, drawings and blueprints of the proposed new building; retained George A. Fuller Co., building contractors, to prepare bids, estimates and engineering plans in connection with the proposed construction, and take test borings of the land; and retained Charles F. Noyes Company, Inc., real estate agents, to negotiate leases and arrange mortgage financing for the proposed building. On October 30 and November 2, 1952, articles appeared in the New York World-Telegram and Sun and the New York Times announcing the intention of Davies, Inc. *136 , and Marion Davies to construct the "Tiffany of all buildings" and showing a photograph of a model of the proposed new building. After the architects prepared original plans of the proposed building, they recommended the acquisition of an adjacent 19foot strip of additional land in order to allow for the construction of a 2-story building which would house on its roof the utilities for the larger building and thus allow the maximum economic use of the original land area. In a report to Bautzer and Maree dated August 5, 1952, Grant transmitted revised plans and drawings of the building as it would appear if the additional land were acquired, together with cost estimates and proposed financing arrangements, and proposed contracts with Kahn and Jacobs, George A. Fuller Co., and the then proposed lease with National City Bank. Grant's memorandum was approved by Marion Davies and on September 26, 1952, the adjacent 19 X 100-foot parcel of land at 65 East 57th Street with the building contained thereon was acquired for $175,000 by the 65 East 57th Street Corporation. This property was conveyed to Davies, Inc., on January 19, 1953. Noyes negotiated a lease between Davies, Inc., and the *137 National City Bank which was executed on August 27, 1952. This lease provided for a 21-year term with a 19-year renewal option and covered space in the proposed new building. The lease then in existence was to be cancelled when the bank vacated the old premises, but not later than January 31, 1953, or the date on which the last tenant of the Park Avenue properties vacated, whichever occurred the later. Davies, Inc., expressly reserved the right to cancel this new lease at any time prior to October 1, 1952, if (a) the type of building contemplated was prohibited by law, (b) there was a substantial increase in construction costs so as to make the building uneconomical, or (c) Davies, Inc., was unable to acquire the 65 East 57th Street property at a reasonable cost. At the time Davies, Inc., contemplated construction of the new office building, bids and material commitments were generally considered to be binding for only a 6-month period because of the controls on materials due to the Korean conflict. Any rise in the cost of materials or in the cost of the proposed building would have had a direct effect upon Davies, Inc.'s plans for construction. It was originally estimated that *138 the cost of the building would be $5,150,000 plus carrying charges, architects' fees, renting expense and taxes during construction of $552,000, so that the total value of the land of $1,500,000 and cost of the building was expected to be $7,202,000. Grant expected that a long-term mortgage of between $6,600,000 and $7,000,000 could be arranged upon completion of the building. In November 1952, the architect and contractor recommended that the building plans be revised further to utilize the recently purchased 19 X 100-foot area to its full height of 20 floors, and a building permit was issued to Davies, Inc., by the New York City Department of Housing and Buildings on November 12, 1952, for the construction of a building according to such plans. The approval of these plans raised the estimated cost of the building alone to somewhere between $6,500,000 and $7,000,000. In January 1953, Noyes advised that a mortgage of approximately two-thirds of the total value of land and building, or between $4,500,000 and $5,000,000, was the maximum which he felt able to secure. Maree felt that Marion Davies should not risk the additional amount of her personal capital which the increased cost *139 of the building and lower mortgage amount would require. Early in January 1953, Grant went to the west coast for conferences with Maree, and Maree asked Grant to explore the alternatives to construction of the building. Grant suggested that either the land be sold or a partner be sought who would invest cash in an amount equal to the value of the land which would be Marion Davies' investment. Maree felt that the $1,500,000 of land should represent the maximum amount for Marion Davies to place at risk. Upon his return Grant sought out Norman Tishman of Tishman Realty & Construction Co., Inc., hereafter referred to as Tishman, and asked whether Tishman would invest $1,500,000 in cash and construct the building at cost without a builder's fee, Davies, Inc., to contribute the land at a value of $1,500,000, for an equal participation in the proposed building. Tishman considered the proposition for a few days but ultimately rejected it. Tishman thereafter made a countersuggestion to Grant, proposing that it take a ground lease of the land from Davies, Inc., and undertake the construction of the building. On February 6, 1953, Grant wrote a memorandum to Maree and Bautzer setting forth the *140 change in the mortgage situation and the fact that on a possible cost of $7,000,000 for the building a mortgage of not more than $5,500,000 to $6,000,000 was all that could reasonably be anticipated. Grant stated that it appeared that "the condition of Miss Davies' assets * * * were such that there was no need or urgency to go into speculative ventures" and it had therefore been determined to proceed with the construction of the building only if a good long-term lease of the property could not be obtained. He asked for authority to attempt to negotiate a ground lease for a 50-year term of $100,000 a year net rental with a 50-year renewal privilege, payment of rent to begin on completion of a new 20-story modern office building to be constructed by the tenant, and the tenant to take subject to the lease with National City Bank and to hold Davies, Inc., harmless by reason of such lease. Marion Davies, Maree and Bautzer authorized Grant to negotiate for a ground lease, and he negotiated with Tishman and also with other prospective lessees, one of whom offered $110,000 net rental. He also offered National City Bank a ground lease of the property in substitution for its lease of August 27, 1952, but *141 it displayed no interest. On April 17, 1953, a lease was entered into between 460 Park Corp., a subsidiary of Tishman, and Davies, Inc. The commencement date of this lease was May 29, 1953. Under its terms the Park Avenue properties and 65 East 57th Street were leased to 460 Park Corp. for a 50-year term at an annual rental of $105,000, net of all expenses, with a renewal option for an additional 50-year term at a net rental of 5 1/4 per cent of the value of the land at the date of renewal, exclusive of improvements, but not less than $105,000 per annum. Under the terms of the lease 460 Park Corp. agreed to demolish the existing buildings on the premises and to construct a first-class modern office building at least 20 stories in height plus basement, to be known as "The Davies Building." It further agreed to assume Davies, Inc.'s obligations under its lease with National City Bank and to indemnify Davies, Inc., against any claims under such lease. On April 21, 1953, Davies, Inc., assigned its interest in the bank lease to 460 Park Corp. On April 17, 1953, Davies, Inc., entered into an agreement of modification of the lease of August 27, 1952, with National City Bank at the request *142 of 460 Park Corp. and Tishman. The bank agreed that the modification would be effective only if the ground lease between 460 Park Corp. and Davies, Inc., was entered into on or before May 31, 1953. 460 Park Corp. constructed a new building but made no use of the plans which had been drawn by Kahn & Jacobs or by George A. Fuller Co. for Davies, Inc. Davies, Inc., paid Kahn & Jacobs $42,000 for its time charges and paid $10,000 to George A. Fuller Co. for its services. Davies, Inc., paid Charles F. Noyes Company, Inc., $19,731.25 representing one-half of its commission due under the National City Bank lease; in addition, Noyes received $20,268.75 from Tishman. Petitioners compute the net operating income before taxes of the Park Avenue properties for 1951 and 1952 as follows: 1951
Rental income
$118,175.95
Other income
1,296.68
$119,472.63
Interest expense
$ 4,620.00
Depreciation
12,600.29
Other operating expense
77,110.29
94,330.58
Net operating income before taxes
$ 25,142.05
1952
Rental income
* 109,884.79
Other income
13.00
$109,897.79
Interest expense
$ 4,672.50
Depreciation
** 7,058.95
Expense of vacating ten-
ants
3,811.23
Other operating expense
71,152.60
86,695.28
Net operating income before taxes
$ 23,202.51
*143 Opinion The parties are in disagreement as to whether petitioners' actions in 1952, the only year before us, were sufficiently decisive to entitle them to some sort of deduction in that year attributable to the remaining basis of a group of buildings. The buildings were not demolished nor even abandoned until the following year but petitioners insist that their intention was so firmly established in 1952 and the actions taken were so definitive that either petitioner Cosmopolitan is entitled to deduct the full remaining basis in that year or, in the alternative, that there were losses from accelerated depreciation, obsolescence or loss of useful value so that Cosmopolitan and Davies, Inc., should each be entitled to deduct approximately one-third of the remaining basis leaving the last one-third for deduction in the following year. Beginning sometime in 1951 Cosmopolitan initiated a study of the economic value of its property which led to a report to it recommending that some action be taken to bring the property more into line with current neighborhood developments. Architects, building contractors *144 and even a real estate agent were retained, together with an attorney whose function it was to endeavor to eliminate existing tenancies in the old buildings. Progress was made toward the latter objective although most of the tenants had not actually vacated by the end of the year. An adjacent piece of property had been acquired but no specific agreements for demolition or construction had been made. Early in 1953 plans for construction of the new building were abandoned completely and a net long-term lease was entered into requiring an abandonment of the buildings and termination of all existing tenancies. The intriguing philosophic difficulty inherent in these facts is that if petitioners were not entitled to the loss prior to 1953, their recovery of basis would have to take the form of adding the unrecovered basis of the old buildings to the cost of the new property acquired. This would be so whether the buildings were abandoned or demolished for the purpose of acquiring a new building on the same site on the one hand, or a long-term lease of the property on the other. Estate of Edgar S. Appleby, 41 B.T.A. 18, *145 affd. (C.A. 2) 123 Fed. (2d) 700; Henry Phipps Estates, 5 T.C. 964; Laurene Walker Berger, 7 T.C. 1339; Blumenfeld Enterprises, Inc., 23 T.C. 665, affirmed per curiam (C.A. 9) 232 Fed. (2d) 396. And in that posture of the problem it would signify nothing which alternative petitioners had in mind, or, indeed, whether they had any specific future development in contemplation. They did not demolish or abandon the buildings in 1952. W. H. Kaye et al., 7 B.T.A. 678; Reporter Pub. Co. v. Commissioner, (C.A. 10) 201 Fed. (2d) 743, affirming 18 T.C. 86, certiorari denied 345 U.S. 993. And since they could not thus obtain an immediate deduction on account of events transpiring in 1953, it is difficult to see that the preparatory steps taken principally in the latter part of 1952 could successfully enable them to recover their entire basis in that year or the succeeding one when a few months' difference would eliminate such immediate recovery entirely. But be that as it may, we regard respondent's concession as eliminating the necessity for deciding any of these questions. *146 "For all intents and purposes therefore, it may be conceded that if petitioners succeed in proving that 460 Park Avenue (building) [the only building having a substantial remaining undepreciated basis] had a remaining useful life of only 18 months from January 1, 1952 based on conditions known to exist at the end of 1952, petitioners have won this accelerated depreciation issue in toto." [Respondent's brief; italics added.] Whether this concession is to any extent based upon respondent's disagreement with some of the authorities above cited, we need not speculate. Estate of Edgar S. Appleby, supra; Henry Phipps Estates, supra. It seems to us that the record clearly shows that by 1953 both the changes in the character of the neighborhood and the activities engaged in by petitioners were bound to make these structures economically valueless, and that these conditions were known to exist at the end of 1952. Whether, in fact, the conditions were not foreshadowed 7 or 8 years previously, we need not decide, since the premise of respondent's concession deals only with the period beginning January 1, 1952. And since the issue was foreshadowed in the original *147 pleadings, it was unnecessary for petitioners to amend at the trial. We conclude on this issue that respondent's position, coupled with the facts clearly depicted by the record, makes it necessary to accept petitioners' alternative contention and permit deduction of 7/18 of the remaining basis to Cosmopolitan and 5/18 to Davies, Inc., in the year 1952. It may be added parenthetically that we intimate no opinion as to the availability of any remaining deduction in 1953; and that whatever deduction is permitted to either petitioner should be in lieu of normal depreciation for that period and not in addition to it. The remaining issue deals with payments made to tenants and rent collections forgiven in order to bring about agreements looking toward the vacating of the premises. As to both of these items we think the deficiency should be sustained. There is some conflict in the authorities as to whether a payment made to a lessee in order to acquire a new asset, such as a building or new lease, is to be deducted over the term of the old lease or over the life of the new asset. Cf. Clara Hellman Heller Trust No. 7610, 7 T.C. 556, *148 revd. sub nom. Wells Fargo B. & U. Trust Co. v. Commissioner, (C.A. 9) 163 Fed. (2d) 521; Laurene Walker Berger, supra, with Business Real Estate Trust of Boston, 25 B.T.A. 191. This also is a problem we need not meet. The issue in these cases was not as it is here, whether a payment so made could be "expensed" and deducted currently; but only whether as a capital expenditure it should be amortized over one period or another. In none of the cases cited was a taxpayer permitted to deduct the entire amount in the year of payment. Here, the tenancies being terminated by the agreements in question were not enjoyed under existing leases but constituted so-called statutory tenancies available because of the protection of the rent control statutes. Had petitioners not taken the action which they did and thereby succeeded in obtaining possession of the premises, it is impossible to say with assurance that such tenancies might not have continued for an indefinite period into the future. See Commissioner v. McCue Bros. & Drummond, Inc., (C.A. 2) 210 Fed. (2d) 752, affirming 19 T.C. 667, certiorari denied 348 U.S. 829. *149 It was in fact this uncertainty which led, at least in part, to the decision to obtain voluntary removals in exchange for the consideration offered by petitioners. Under the circumstances, we think it necessary to regard these items as additional costs of the new lease to be amortized over its term. Business Real Estate Trust of Boston, supra.See Chas. N. Manning et al., 7 B.T.A. 286; Pig & Whistle Co., 9 B.T.A. 668; M. & F. Holding Corporation, 26 B.T.A. 504; The Denver & Rio Grande Western Railroad Co., 32 T.C. 43 (April 10, 1959). Cases dealing with termination of an existing lease so that the landlord can himself use or re-let the property in its existing form, such as Clara Hellman Heller Trust No. 7610, supra, are quite different from such a situation as we have here. In the former, all that the landlord is acquiring by eliminating the old lease is the use of the same property for the length of the old tenants' unexpired term. Everything else he already owns. See Peter P. Risko, 26 T.C. 485. *150 Where, as here, however, the leases are being terminated in order either to erect a new structure or to obtain a new long-term lease extending substantially beyond the old tenancy, the landlord has acquired a new asset which he did not previously possess. With respect to it, the cost of eliminating the old lease, like the loss on demolition of old structures, Chas. N. Manning et al., supra, or the expense of building material, or any other factor contributing to the new asset, M. & F. Holding Corporation, supra; The Denver & Rio Grande Western Railroad Co., supra, is a capital expenditure to be amortized over the life of the newly acquired property. Business Real Estate Trust of Boston, supra. We see no distinction for this purpose between the payments actually made by petitioners in cash or its equivalent and the rent collections forgiven, which would otherwise have been received. It is true that the latter aspect of the issue arises not by way of disallowance of a deduction but because respondent has added back to petitioners' income the amounts they would have received but forgave. The situation, however, we consider to *151 be no different from what would have happened if petitioners had collected the rents, as they would otherwise have every right to do, and then repaid an equivalent amount to the tenant. Such a procedure would assimilate the payments to the situations where cash was actually paid out. In theory, we see no reason why one should be treated differently from the other. With respect to rents which had already become due and were forgiven, which thus constituted income already earned, but which petitioners voluntarily refrained from accepting, there seems little doubt that the doctrine of constructive receipt must necessarily apply. Morgan v. Finnegan, (C.A. 8) 182 Fed. (2d) 649. This would be true even though petitioners were not, as they in fact were, on an accrual basis of accounting. In addition, a comparatively insignificant amount of rent [1] was forgiven before it became due. Even as to this it seems to us the same principle must apply. Had petitioners taken no action, the continued occupancy by the tenant would automatically have created an obligation to pay the rent. Petitioners *152 received a valuable consideration for their agreement to permit the tenant to occupy the premises but not to collect the rents. Hort v. Commissioner, 313 U.S. 28. This was thus no more than an anticipatory realization of future income, for which the one entitled to the income has invariably been held accountable. United States v. Joliet & Chicago R. Co., 315 U.S. 44. Decisions will be entered under Rule 50. Footnotes
*. Rentals waived in the sum of $2,647.25 are excluded. ↩
**. To July 30, 1952.↩
1. The largest amount finding support in the record is $519.50 out of the total amount of $2,647.25 which was waived.↩